[No. D037784. Fourth Dist., Div. One. Nov. 6, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
ALDO ADKINS, Defendant and Appellant.

**COUNSEL**

Allen R. Bloom for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry J. T. Carlton and Gary W. Brozio, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HUFFMAN, Acting P. J.**—A jury convicted Aldo Adkins of first degree murder (Pen. Code,[1] § 187, subd. (a)) and found true the allegation he personally used a deadly and dangerous weapon, a knife, in the commission of the offense (§ 12022, subd. (b)(1)). Adkins thereafter admitted he had previously served two prior prison terms within the meaning of section 667.5, subdivision (b). The trial court sentenced Adkins to prison for 25 years to life for the murder plus three consecutive years for the prison prior and weapon use enhancements.

Adkins appeals, claiming ineffective assistance of counsel. We affirm.

### FACTUAL BACKGROUND

Although no one witnessed the murder of Minnerva Rummel-Cuellar (Minnie)[2] in April 1999, the initial investigation pointed to Adkins, who had stayed at her apartment shortly before her death, as the murderer. It was stipulated that his stepfather "[had] provided information to law enforcement that [Adkins] had gone to Mexico [and had] provided the address where [Adkins] was staying in Mexico. . . ." It was also stipulated that Adkins went to Mexico on April 4, 1999, and that "[o]ne week after the discovery of Minnie['s] body, the defendant's attorney, Mr. [George] Siddell, contacted [authorities, telling them Adkins] would voluntarily surrender to U. S. law enforcement." After missing two scheduled dates, Adkins surrendered into

---

[1]All statutory references are to the Penal Code unless otherwise specified.
[2]The trial transcript also often refers to Minnie as "Mini."

law enforcement custody on April 20, 1999. At that time the authorities collected his clothes, including a pair of Nike shoes he was then wearing.

The trial evidence, which included these stipulations, showed that before her death, Minnie was separated from her husband, worked as a bartender at the Briar Patch Bar and lived nearby in an apartment complex in Chula Vista. Sometime in late December 1998, or early January 1999, Lewis Estep met Minnie at the Briar Patch and developed a close, though not intimate, relationship with her. Estep often drove Minnie home from work, sometimes loaned her his truck and often slept over at her apartment. When he came over to visit her, Estep, who did not have a key to Minnie's apartment or to the complex's security gate, would knock on her bedroom window and she would let him in. Estep usually talked with Minnie several times a day.

Sometime in March 1999, Estep met Adkins through Minnie when he came to her apartment several times. The second time he saw him there, Adkins brought some bags of clothing to the apartment. It was Estep's understanding that Minnie was allowing Adkins to temporarily stay there.[3] Minnie had given Adkins keys so he could come and go from the apartment.

On three occasions when Estep was at Minnie's apartment at the same time as Adkins, he saw Adkins with an eight-to-10-inch hunting knife with an ivory handle, which Adkins carried in a sheath in the small of his back. Estep also saw Adkins use drugs and supply Minnie with drugs. Estep saw Adkins with a Tupperware container with "a lot of baggies filled with . . . rock crystal." One time when she was driving his truck, Minnie telephoned Estep on her cell phone, telling him Adkins was acting "real wild and crazy, erratic[,]" and that she was scared and wanted out of the truck. Estep testified Minnie sounded "very scared."

About 7:30 a.m. on April 2, 1999, Minnie drove Estep to work and then kept his truck for the day. He spoke with her around noontime and told her he needed to be picked up at 4:00 p.m. When she was not there to pick him up, he called her on her cell phone. Minnie told him she would be around 15 minutes late because she had to run a quick errand, but she never showed up. Estep repeatedly tried to call and page her, but Minnie did not respond. According to Estep, this behavior was entirely out of character for Minnie, who always checked her voice mail and pages.

At 8:00 p.m., Estep finally called his father to pick him up. They drove to Minnie's apartment complex and looked in the parking lot for Estep's truck.

---

[3]At the end of trial it was stipulated that Adkins had moved in with his wife and family on March 22, 1999, after having been away for some time, but that after receiving a telephone call from an uncle on March 26, 1999, he had moved out and into Minnie's apartment "where he had not lived before."

Not finding it, Estep then knocked on Minnie's bedroom window, but there was no response. After leaving the area, Estep continued to call Minnie without success.

Just after midnight, Estep passed by Minnie's complex and saw his truck. When he again called her cell phone, Adkins answered, telling Estep that Minnie was not there and that he did not know where she was. Estep told Adkins he was coming to pick up his truck. When he knocked on Minnie's window, Adkins came out and gave Estep his keys. When Estep refused Adkins's request to continue to use his truck, Adkins asked him to return the keys to Minnie's apartment. Estep told Adkins he had no keys and the two went to the truck where Adkins retrieved a pair of sunglasses from the truck's dash. Estep noticed that the seat of the truck was all the way back which was unusual since Minnie needed the seat much further forward.

Later that morning, Saturday, April 3, 1999, Estep returned to Minnie's apartment, knocking on her window as well as her front door. During this 8:30 a.m. visit, he noticed that the light was on in the bathroom. Estep got no answer again when he returned to Minnie's around 11:30 p.m. that night and again knocked at the window.

At some point in time, Estep received a response to one of his continuing pages to Minnie from an unidentified man who said he did not know where she was. Estep also got another call back from someone named "Clumsy." The next day, before Estep left for Arizona to visit family on that Easter Sunday, he again attempted to contact Minnie. The response he received was that her voice mailbox was full. He got the same response the next day when he tried to reach Minnie from work. He then contacted an acquaintance of Minnie's, named Maribel Romero, to meet him after work and accompany him to Minnie's apartment to check on her welfare. At the apartment complex they contacted the manager, who in turn asked the assistant manager Tommy Mootry, to accompany them to Minnie's apartment to investigate.

When Mootry opened the door, Estep noticed that the dead bolt to the apartment was locked which was unusual because he had never seen Minnie use it. Estep also saw that Minnie's keys and bicycle were in the apartment, commenting she never left without her keys and the bike was her only means of transportation. Estep also did not see Minnie's pager or cell phone which she always kept with her.

As for the condition of Minnie's apartment, Estep testified the kitchen was a mess. There was a Budweiser bottle there which was probably Adkins's

since he drank that type of beer and Minnie did not; the lights were on in the living room and the bathroom, but not in the bedroom; and the bathtub contained a Pyrex dish, a Tupperware container with bloody rags, and cleaning supplies. Estep thought it looked as though someone had tried to clean up something in the bathroom. When Estep turned on a lamp in the bedroom he saw that the bed was stripped clean, a Kmart bag was on the floor and the comforter to the bed was underneath the mattress. When the bag was moved to the side, Estep saw a large bloodstain near the nightstand. The bedroom had a foul smell. When Estep attempted to lift the bed, Mootry stopped him, saying "Let's go ahead and leave the apartment and go call somebody to come and take a look at this." They all left and the police were called.

The first police officers to arrive at Minnie's apartment looked under the bed and saw a comforter stuffed underneath it that had a red stain which matched the stain on the carpet. The officers lifted the box springs and mattress and took photographs of a body wrapped in the comforter. They then pulled back the upper portion of the comforter and saw and photographed what appeared to be legs and blue jeans inside. Homicide detectives called to further process the crime scene, took more photographs, lifted prints and impounded evidence. In addition to the evidence described by Estep and the first officers,[4] the detectives found two false fingernails, one new and the other torn from Minnie's thumb, and paperwork belonging to Adkins. They found no evidence of forced entry into Minnie's apartment.

Subsequent tests of the fingernail scrapings showed Minnie's own DNA present. A latent print examiner testified Adkins's fingerprints were identified on various items in the apartment, including a 40-ounce Budweiser bottle, a Pepsi cup, and a wine glass found in the kitchen; on the inside of the front door next to the peep hole; and on the Pyrex dish and Tupperware container found in the bathroom.

Further investigation revealed that Minnie's acquaintance Maribel, a hairdresser, had telephoned her on Saturday about a scheduled hair appointment, but Minnie never answered her call and her voice mail responded that it was full. Maribel also testified that the next day about 1:00 a.m., she got a page to pick up someone in Jamul. When she did so, a man named Clumsy came to the car and told her someone else needed a ride that rainy night from behind the Kmart in Chula Vista which was near Minnie's apartment complex. When she got to the area, she saw Adkins waiting for a ride in front of the apartment complex. Maribel noticed that Adkins looked startled

---

[4]Mootry's testimony was consistent with Estep's and the officers' testimony about what was found upon entering Minnie's apartment.

and shocked as he got in the car. When she turned to look at him, he appeared disturbed and somewhat scared. As she drove off, Adkins changed his mind and decided to go back to his own car parked at the apartment complex. Maribel accompanied Estep and Mootry the following Monday to Minnie's apartment "in case something had gone wrong." Maribel's testimony about entering the apartment tracked that of Estep's and Mootry's. Maribel stated she knew something had happened after seeing the blood on items in the shower and shopping bags in the bedroom, and got a "bad feeling. . . ."

Minnie's next-door neighbor testified that around noon on Saturday, April 3, 1999, a man resembling Adkins answered her door when he went there to inquire whether she wanted to go to church. The man told the neighbor Minnie was not home. Another neighbor also said he saw Adkins leave Minnie's apartment at around noon that day. The same neighbor had seen Estep that morning knocking on Minnie's apartment back window while he called out to her before stopping and using a cell phone.

Much of the remaining prosecution case consisted of forensic evidence. Deputy Medical Examiner Christina Stanley, who worked as a forensic pathologist, testified as to her findings after observing Minnie's body at the scene of the crime and also during the autopsy. Stanley first examined the body 12 hours after its discovery, finding it cold, that it had slight rigor mortis and less lividity (settlement of the blood) than expected due to extreme loss of blood. She also found discoloration of the skin, drying, early mummification of the hands, and a strong odor. Based on her findings, Stanley opined Minnie had been dead three days, plus or minus one day, with the greater likelihood that the time of death was in the three to four day range because of the stage of decomposition.

During the autopsy performed the next day, Stanley determined Minnie had bled to death from two cuts and a stab wound to her neck that had cut two carotid arteries, severed her larynx, and punctured her jugular vein. Although Stanley also saw minor blunt force injuries to Minnie's back, neck and elbow, she could not say when they occurred. Even though Stanley did not observe any defensive wounds, she admitted on cross-examination she could not rule out the possibility of a fight. She also conceded that it was not easy to pin down a time of death. As Stanley explained, by relying "on a lot of circumstantial evidence" which was consistent with her findings, she thought the time of death was probably sometime between late Friday or early Saturday morning. Based on such she thought it unlikely that Minnie was still alive later Saturday morning. On further cross-examination, Stanley agreed that the temperature of the room as well as the fact Minnie's body

was wrapped in a comforter could have affected the degree of decomposition of her body because the warmer the temperature, the more rapid the decomposition, rigidity and lividity.

Sacramento Sheriff's Sergeant Brian Kennedy, who also worked part time as a consultant in crime scene reconstruction through bloodstain interpretation, testified as an expert regarding "blood spatter analysis and interpretation as well as crime scene analysis and interpretation." After reviewing the police reports, crime scene photos, autopsy report and photos, and the physical evidence, Kennedy opined that when Minnie was attacked, she was "prone, flat-down, face-down on the floor with her head lifted just enough, probably, to cut her throat." He supported this theory with the facts there was no blood on the bed, in Minnie's hair, past her waist, or on the back of her blouse or jeans. Due to the blood spatters found and the natural course of blood flow caused by the type of wounds inflicted, Kennedy believed the killer was behind the victim when she was cut, that her head was turned to the left, and that the blood from her arteries had splashed on her face and the nearby nightstand during the assault.

Kennedy further opined Minnie either lost her fingernail during an initial struggle or when her body was moved and deposited under the bed after the attack. Although there was no broken furniture or obvious signs of a struggle, based on the abrasions and contusions on Minnie's body, Kennedy said there could have been some struggle that did not last very long before she was cut. Kennedy guessed that the killer was right-handed, most likely worked alone, and had put Minnie on the floor next to her bed before drawing a dull knife across her throat several times.

Kennedy noted that while reviewing the evidence he discovered a bloody shoe print on Minnie's bed skirt found inside the Kmart bag that matched the pattern on the shoes worn by Adkins at the time of his arrest. On cross-examination, Kennedy conceded that the herringbone pattern of Adkins's shoe which was consistent with the print found on the bed skirt was a common pattern that could be consistent with at least a million shoes. Kennedy also admitted that a kitchen knife found in Minnie's dishwasher was capable of inflicting Minnie's fatal wounds. Kennedy did not inspect the victim's jeans for carpet fibers which could have assisted in determining her position when she was attacked.

Finally, the manager of the Chula Vista Police Department's crime laboratory testified the bloody shoe print found on Minnie's bed skirt, or dust ruffle, matched five points on Adkin's right shoe herringbone pattern that was in evidence. These points were "class" characteristics or general characteristics which are not unique and therefore the expert could not say that

the print was made by Adkins's shoe, only that it was similar. On cross-examination, the expert conceded there was no way of knowing how many other shoes could make the same print. The expert also stated that when Adkins's shoes were sent to the laboratory for blood evidence analysis, they came back negative.

The defense rested, relying on the state of the evidence.

## DISCUSSION

■ Adkins's sole contention on appeal is that he was denied the effective assistance of counsel because his trial counsel failed to present the testimony of an independent pathologist to refute the time of death and the blood spatter expert's testimony, and also failed to present evidence that it was counsel's fault that he missed two scheduled surrender dates. Adkins cannot establish ineffective assistance of counsel on this record.

■ With regard to a claim of ineffective assistance of counsel, the defendant has the burden of first showing that trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and second, that even if such is found unreasonable, the challenged acts or omissions of counsel were prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-688, 692 [104 S.Ct. 2052, 2063-2065, 2067, 80 L.Ed.2d 674].) An assessment of counsel's performance does not include the distorting effects of hindsight, but rather evaluates such at the time of the claimed errors and in light of all the circumstances. (*Id.* at p. 689 [104 S.Ct. at p. 2065].) There is a strong presumption that counsel's representation was reasonable. (*Ibid.*) Defendant must show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*Id.* at p. 694 [104 S.Ct. at p. 2068].) A reasonable probability "is a probability sufficient to undermine confidence in the outcome." (*Ibid.*; *In re Harris* (1993) 5 Cal.4th 813, 832-833 [21 Cal.Rptr.2d 373, 855 P.2d 391].)

■ Here, Adkins cannot show his trial counsel's performance was deficient under prevailing professional norms. There is simply no indication in the record whether Adkins's counsel consulted an independent pathologist, why he determined not to present one at trial, or why he entered into the stipulation about Adkins's missed surrender dates. ■ Our Supreme Court has repeatedly stressed that " '[i]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must

be rejected." (*People v. Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212] (*Wilson*), quoting *People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1] (*Pope*).) Thus, "[a]ppellate courts reverse convictions on the ground of inadequate assistance of counsel *only* when the record affirmatively reveals that counsel had *no rational tactical purpose* for an allegedly incompetent act or omission." (*People v. Milner* (1988) 45 Cal.3d 227, 238 [246 Cal.Rptr. 713, 753 P.2d 669].)

■ The record in this case reveals no reasons why Adkins's counsel acted or failed to act in the manners challenged and such are not inherently incompetent. Nor was Adkins's counsel asked below why he did or did not do the challenged acts. Under such circumstances, a claim for ineffective assistance of counsel is best left for decision in a habeas corpus proceeding.[5] (*Wilson, supra*, 3 Cal.4th at p. 936; *Pope, supra*, 23 Cal.3d at p. 426.)

Moreover, although the record is absolutely void of evidence concerning why Adkins missed his set surrender dates, it suggests there may have been good reasons why Adkins's counsel decided not to present the testimony of an independent pathologist. The testimony of the prosecution expert acknowledged Minnie could have been killed a full day later than she opined was the time of death. Because Adkins's argument that an independent expert could have set the time of death as late as 12 hours after he was last seen at Minnie's apartment is included in that extra day, defense counsel may have determined that an independent expert had nothing useful to add. Certainly, based on all the physical evidence, it is doubtful an independent pathologist could have scientifically opined any later time of death.

Further, there is nothing in the record to show the blood spatter expert rendered any opinions outside his expertise, or that they were incorrect, as Adkins asserts. Adkins fails to recognize that that expert was also qualified to testify about crime scene reconstruction based on the bloodstain interpretation. Adkins's argument that an independent expert could have shown that Minnie's position when she was slashed was standing and not prone thus negating premeditation and deliberation is purely speculative. To the extent he is urging that an independent expert could have shown that Minnie was "in the midst of a struggle or battle" with her assailant when cut, such evidence was already in the record through testimony of the prosecution's pathologist and blood spatter experts. Neither expert could rule out a fight

---

[5]Adkins also filed a petition for writ of habeas corpus during the pendency of this appeal, which we have considered with this appeal and have separately denied without prejudice to Adkins to renew his claim in the superior court. (See *In re Adkins* (D040022) order filed Nov. 4, 2002.)

before the fatal injuries. No fault can be found for not presenting a defense expert to say essentially the same things.

Adkins simply fails to look at the big picture. This was not a close case. He was seen outside the victim's apartment after 1:00 a.m. on Easter Sunday, which is a time beyond what he represents his independent expert would testify was the time of death. The clothes he was wearing when he surrendered nearly two weeks after the murder were not shown to have been the ones that he wore when last seen in or near Minnie's apartment. In light of such evidence, we do not believe that any competent attorney would have called an independent expert to testify there was no blood on such clothing because Adkins could have easily washed them, disposed of them, or changed them before turning himself in to the authorities.

In addition, we agree with several persuasive federal cases that hold a trial attorney is not remiss for failing to present additional scientific or medical evidence rather than relying upon the opinions of the prosecution experts where there is no cause to suspect that additional expert testimony or evidence would lead to a different conclusion. (See *Lewis v. Alexander* (6th Cir. 1993) 11 F.3d 1349, 1353 [defense counsel may rely on the professional opinion of a coroner in formulating his defense strategy]; *Foster v. Dugger* (11th Cir. 1987) 823 F.2d 402, 407 [defense attorney need not pursue additional medical evidence].)

In sum, because Adkins has failed to make even a prima facie showing that his trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, we need not further discuss whether his counsel's actions or omissions were prejudicial. No ineffective assistance of counsel has been shown.

DISPOSITION

The judgment is affirmed.

O'Rourke, J., and McConnell, J., concurred.