Filed 5/21/25  P. v. Coats CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL ALLEN COATS,<br><br>    Defendant and Appellant. | F086917<br><br>(Super. Ct. No. CR-19-012221)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Carrie M. Stephens, Judge.

Matthew J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant and appellant Daniel Coats of gross vehicular manslaughter while intoxicated and hit and run resulting in injury, both arising out of a single accident involving the victim Jose Mora.  The court sentenced Coats to a total term

of 25 years imprisonment.  On appeal, Coats contends that:  (1) there was insufficient evidence of causation to convict him of vehicular manslaughter; (2) the trial court committed instructional error by instructing the jury that he bore the burden of proving that he was not intoxicated; (3) he received constitutionally ineffective assistance of counsel because his counsel: (a) failed to impeach two percipient witnesses with inconsistent statements they made to the police, (b) failed to cross-examine the prosecution's expert witness about Mora's rib fractures occurring post-mortem, and (c) failed to introduce evidence that Coats had suffered a traumatic brain injury one month before the accident; and (4) the cumulative effect of the above errors resulted in an unfair trial.  We affirm.

## **PROCEDURAL BACKGROUND**

On June 20, 2023, the Stanislaus County District Attorney filed an amended information and charged Coats with:  one count of vehicular manslaughter (Pen. Code,[1] § 191.5, subd. (a); count 1); and one count of hit and run with injury (Veh. Code, § 20001, subd. (a); count 2).  As to count one, the information alleged as enhancements that Coats personally inflicted great bodily injury (§ 1192.7, subd. (c)(8)), fled the scene of an accident (Veh. Code, § 20001, subd. (c)), and had suffered a prior serious felony (§ 667, subd. (a)).  As to count 2, the information alleged as an enhancement that Coats's actions caused the death of another (Veh. Code, § 20001, subd. (b)(2)).  As to both counts, the information alleged enhancements under California Rules of Court,[2] rule 4.421(a), (b)(2), (b)(3), (b)(4), and (b)(5) and that Coats had a strike prior ((§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

Also on June 20, 2023, a jury trial commenced.  The trial ended on June 29, 2023. The jury found Coats guilty on both counts and found true the enhancements for personal

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

[2] All further rule references are to the California Rules of Court.

2.

infliction of great bodily injury, fleeing the scene of an accident, and engaging in conduct that resulted in the death of another.  In a bifurcated proceeding, the trial court found true that Coats had suffered a prior serious felony and a strike prior and found true the aggravating circumstances of rule 4.421(b)(2) and (b)(3).  The court struck the rule 4.421(a) circumstance and granted the prosecution's motion to strike the rule 4.421(b)(4) and (b)(5) circumstances.

On August 30, 2023, the court sentenced Coats to a total term of 25 years as follows:  on count 1, 25 years (the upper term of 10 years doubled by the strike prior, plus five years for the flight enhancement); on count 2, eight years (the upper term doubled by the strike prior) stayed pursuant to section 654.  The court also struck the count 1 prior serious felony enhancement.

On September 26, 2023, Coats filed his notice of appeal.

## FACTUAL BACKGROUND

A little after 11:30 p.m. on December 26, 2018, Mora was driving a manual transmission pickup truck in a southbound lane on Lander Avenue in Turlock.  Lander Avenue is a five-lane road with two northbound lanes, two southbound lanes, and one shared middle left turn lane.  The speed limit on Lander Avenue is 40 miles per hour.  Mora was traveling at 24 miles per hour and drove his car to the shoulder of the far right lane.  After letting other cars pass, Mora began making an illegal U-turn across the two southbound lanes.  As Mora was attempting to make the U-turn, a Mustang that was traveling at 79 miles per hour in the inner southbound lane crashed into Mora's pickup truck.  The force of the impact caused Mora's pickup truck to split into two pieces (the cab and the bed) and the driver side of the cab to bend inward.  At the time of the accident, Mora had been traveling in the direction of his home, but a successful U-turn would have had him traveling towards the Turlock hospital, which was about three miles away.

3.

Just after the collision occurred, E.F. and her boyfriend A.C. drove up to the accident scene. Although they did not see the accident actually happen, they saw dirt in the air, car parts on the ground, the two pieces of the pickup truck, and the damaged Mustang (which was 300 to 400 feet away). From the severed cab of the pickup, A.C. and E.F. saw Mora essentially hanging by his seatbelt. They saw Mora "take his last breath." That is, Mora breathed in "one last time and [then] he just let go." An unknown woman appeared and attempted to give Mora CPR.

E.F. saw two people who had been in the Mustang, Coats and his girlfriend. E.F. observed Coats walking around the accident site looking worried, nervous, and sweaty. She heard Coats say to someone on his cellphone, "Come and pick me up right now. I just got into a car accident." Later, A.C. heard Coats on the cellphone say, "Get me out of here. They don't know its me."

About 10 minutes following E.F. and A.C.'s arrival, the police arrived at the scene. Turlock Police Officer Brett Conrad went to the cab of the truck. He saw Mora hanging by the seatbelt from the cab. He also saw two women trying to get Mora out of the cab, and one of the women was attempting to give Mora mouth to mouth resuscitation. Conrad cut the seatbelt to free Mora and then began to perform chest compressions on Mora. While performing chest compressions, Conrad heard Mora's ribs crack. Conrad continued to perform chest compressions for approximately two minutes, at which time fire and ambulance personnel arrived and took over for Conrad. However, the paramedics detected no heartbeat, and Mora was eventually pronounced dead at the hospital. The cause of death was a sudden fatal cardiac arrhythmia.[3]

Around the time that police and medical personnel were arriving on the scene, a black truck arrived and took Coats and his girlfriend away. A.C. told the police that Coats was trying to get away in the black truck. Turlock police officers were able to stop

___
[3] "Arrhythmia" is an irregular heartbeat.

the black truck not far from the accident scene. The black truck had four occupants, including Coats. Coats appeared to be under the influence of alcohol because he was mumbling and unstable on his feet and had red watery eyes, slow lethargic movements, a staggered gait, and a strong odor of alcohol on his breath. Coats also had a fresh laceration on the top of his scalp and his left hand was cut and bleeding. A Turlock police officer escorted Coats to the hospital.

At the hospital, blood and a DNA sample were taken from Coats. The blood draw occurred at 4:45 a.m. on December 27, 2018. The blood sample revealed that Coats had a blood alcohol content ("BAC") of 0.135. At the time of the accident, Coats's BAC would have been about 0.231. A DNA test on some blood found on the driver's side of the Mustang matched Coats's DNA. Additionally, hair found in the windshield of the Mustang was similar to Coats's hair. When officers or medical personnel attempted to talk to Coats, there were times he provided appropriate information and details, but there were also times he either forgot or was in too much pain to answer or give valid information. It was understood that Coats had a "previous injury" prior to the accident with Mora.

## DISCUSSION

### I.    SUFFICIENCY OF THE EVIDENCE AS TO CAUSATION

#### A.    Parties' Arguments

Coats argues that the prosecution failed to show his conduct was a substantial factor in Mora's death because Mora suffered a heart attack prior to the collision. Coats contends that neither of the expert forensic pathologists, Sungook Baik, M.D. and Marvin Pietruszka, M.D., could say with certainty whether the collision did or did not contribute to Mora's death. However, Coats argues the autopsy report shows there was no hemorrhaging around Mora's broken ribs, which means that none of the ribs broke while Mora was alive. Coats argues that if Mora died after the collision, there would have been hemorrhaging around the ribs that broke during the collision. Coats also contends the

5.

fact that Mora was slowly traveling towards home, but then attempted a U-turn that would have had him traveling towards the hospital, circumstantially shows Mora was having a heart attack and attempting to get help. Coats avers that this evidence collectively precludes a conclusion that his actions caused Mora's death.

The People argue there was sufficient evidence to establish causation. The People argue in part that Dr. Baik testified that several factors were involved in causing Mora's heart attack, but also point out that Dr. Baik testified that the collision was the event that caused the heart attack. The People contend this evidence demonstrates that the accident was a substantial factor in causing Mora's death.

### B. Additional Background

*Mora's Medical Condition*

In May 2018, Mora had an electrocardiogram, and in July and August of 2018, he sought treatment for chest pain. Mora also had "significant heart issues," specifically he had an enlarged heart, a slight narrowing of the coronary arteries, thickening of the ventricles, and pale areas in the ventricular myocardia which were due to lack of oxygen from a prior heart attack. The People's expert forensic pathologist Dr. Baik, who performed Mora's autopsy, characterized Mora's heart as "weak," while the defense's expert forensic pathologist Dr. Pietruszka opined that Mora's heart was "failing." Mora was also overweight/obese, a smoker, and had a family history of heart disease. During the autopsy, nine rib fractures (seven on the left and two on the right), abrasions from the left torso to the left flank, and a superficial ankle laceration were detected. Dr. Baik testified that the upper rib fractures were related to the car collision, while the middle/lower rib fractures were related to CPR. At the time of death, there were 4.9 milligrams per liter of methamphetamine and .037 milligrams per liter of amphetamine in Mora's system. Both Dr. Baik and Dr. Pietruszka generally agreed that Mora died from a

sudden fatal cardiac arrythmia, which is a type of heart attack.[4] However, the experts disagreed as to the cause of the heart attack.

*Dr. Baik's Opinions*

Dr. Baik believed that three factors combined to cause Mora's death: the trauma of the collision, the consumption of methamphetamine, and pre-existing heart conditions. However, Dr. Baik concluded that the event that caused the heart attack was the collision. Therefore, Dr. Baik testified that Mora's cause of death was a sudden fatal cardiac arrhythmia "after accident," with contributing factors including pre-existing heart conditions and methamphetamine intoxication. Dr. Baik explained that sudden fatal cardiac arrhythmias can be caused, and are often induced, by sudden impacts or traumas to the chest. Dr. Baik also explained that vehicle collisions can be especially traumatic to the heart and can place the individuals involved at risk of a heart attack due to "the [emotional] shock factor" and the actual physical force from the impact of the collision. Dr. Baik acknowledged that risk would be increased if an individual also had methamphetamine in his system at the time of the accident because methamphetamine can induce cardiac arrhythmias. Dr. Baik also acknowledged that if the heart stops or is placed into arrhythmia due to a major trauma like a car collision, CPR may not be able to help. Dr. Baik had no independent recollection of Mora's autopsy, but he testified there was nothing in his autopsy report that would lead him to believe that Mora was dead prior to the car collision. Therefore, Dr. Baik believed that Mora's fatal cardiac arrhythmia developed after the accident. Nevertheless, Dr. Baik agreed that it was possible that Mora's heart attack may have started before the accident occurred.

---

[4] The parties and both experts referred to the cardiac event that ultimately killed Mora as either a heart attack or a cardiac arrhythmia. For purposes of this opinion, we will also use these terms interchangeably.

*Dr. Pietruszka's Opinions*

Dr. Pietruszka explained that a traumatic cardiac arrest occurs at the time of trauma or post-trauma and can be caused by hypoxia (lack of oxygen), hypovolemia (extensive bleeding) such as a loss of blood due to extensive hemorrhaging, chest fractures that prevent respiration, and brain trauma. Dr. Pietruszka did not believe that Mora fell into any of these categories. Dr. Pietruszka noted that generally pathologists during an autopsy will note any hemorrhaging/bleeding around fractures, but because he did not recall seeing any notations regarding hemorrhaging around Mora's broken ribs, he believed that the rib fractures all occurred after death. That is, because the autopsy did not identify any "acute hemorrhag[ing]" around any of the rib fractures, Dr. Pietruszka believed that none of the rib fractures occurred at the time of collision/impact. Dr. Pietruszka explained that without blood flow, hemorrhaging would not be expected. Dr. Pietruszka also explained that there was no evidence that Mora's blood continued to flow after he died in the pickup truck, and the fact that CPR was performed did not matter because blood does not flow after death, even with CPR. Dr. Pietruszka saw no evidence that the trauma suffered by Mora during the collision was the cause of his heart attack. However, Mora had a level of methamphetamine in his system that fell within the toxic and lethal ranges. Although users of methamphetamine can develop a tolerance to the drug, and Mora's tolerance was significant, if users keep using methamphetamine, they develop cardiac failure. Dr. Pietruszka concluded the methamphetamine in Mora's system caused the heart attack. Specifically, Dr. Pietruszka opined:

> "I believe that the methamphetamine was the significant factor for …
> suffering a fatal heart attack. And the fact that he has this accident it is
> difficult to actually say what affect the accident occurred because the level
> of methamphetamine is so high that it could have caused the accident by
> itself. He didn't need [the accident] to cause him to have a fatal
> arrhythmia. So the methamphetamine alone would have explained what
> happened to him. The accident itself, there's no trauma to his body that one
> can explain that caused traumatic cardiac arrest. So we're left with

basically a person who's at super high risk for having fatal cardiac arrhythmia. And just at the moment there's – there's an accident and he dies. And so whether the accident caused his heart to – to race a little bit and cause him to die suddenly is not entirely clear, but the drug itself alone could have reasonably caused him to die under the circumstances of what we've discussed. He was already in pulmonary edema. His heart was failing. His lungs were filling up with fluid. He had prior – prior [myocardial] infarction. So all of those factors placed him at super high risk for having a heart attack. I don't believe the car accident itself caused this heart attack. I think that the greater probability was that the drug caused – caused the fatal arrhythmia."

Dr. Pietruszka acknowledged that it was not easy to separate the collision from the heart attack or to understand what the collision actually did to Mora. Dr. Pietruszka explained that "we're dealing with a very fine line of a person that's very sick, and could have a fatal cardiac arrhythmia, and an impact that could have caused an increased chance of arrhythmia." When asked whether Mora was going to die at or near the time of the accident due to factors unrelated to the accident, Dr. Pietruszka explained: "With all of the findings that we are aware of, he was at high risk of sudden death. The [e]ffect of the car accident he was at super high risk of sudden death. I can't tell you if he was actually going to die that minute, and I can't tell you what the [actual] effect of the car accident was; we don't know."

### C. Legal Standards

#### 1. Sufficiency of the Evidence

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Morales* (2020) 10 Cal.5th 76, 88; *People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).) Reviewing courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

9.

beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *Morales*, at p. 88.)  As part of this determination, reviewing courts will presume in support of the judgment the existence of every fact that the jury could have reasonably deduced from the evidence.  (*Morales*, at p. 88; *Lindberg*, at p. 27.)  Further, because " 'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends,' " reviewing courts " 'resolve neither credibility issues nor evidentiary conflicts[.]' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161–162; see also *Lindberg*, at p. 27.)  This standard of review is the same whether the prosecution relies mainly on circumstantial evidence or direct evidence.  (See *People v. Westerfield* (2019) 6 Cal.5th 632, 713; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Westerfield*, at p. 713; *Lindberg*, at p. 27.)

### 2. Gross Vehicular Manslaughter While Intoxicated

"Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of [Vehicle Code provisions prohibiting driving while under the influence of alcohol], and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act that might produce death, in an unlawful manner, and with gross negligence."  (§ 191.5, subd. (a); *People v. Sanchez* (2001) 24 Cal.4th 983, 988–989.)  " ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*People v. Carney* (2023) 14 Cal.5th 1130, 1138 (*Carney*); *People v. Jennings* (2010) 50 Cal.4th 616, 643.)  There may be more than one proximate cause of death or injury.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 847

(*Sanchez*).)  A "cause of death" is " ' "an act that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act, the death of a human being[.]" ' " (*Carney*, at pp. 1141–1142.)  Also, a cause will be considered "concurrent" if it was " ' "operative at the time of the [death] and acted with another cause to produce the [death]." ' " (*Id.*, at pp. 1138–1139.)  If a jury finds that " ' "without the criminal act the death would not have occurred when it did, [the jury] need not determine which of the concurrent causes was the principal or primary cause of death." ' " (*Id.*, at p. 1139.)  Rather, it is enough that the concurrent cause was a substantial factor in causing death.  (*People v. Catlin* (2001) 26 Cal.4th 81, 155 (*Catlin*).)

### D. Analysis

There is substantial evidence to support the element of causation.  As described above, Dr. Baik testified that three factors played a role in Mora's death:  Mora's poor cardiac health and medical condition, Mora's ingestion of methamphetamine, and the collision.  Critically, Dr. Baik clearly and expressly testified that the collision was "the event" that caused the sudden fatal cardiac arrhythmia.  Hence, Dr. Baik testified that Mora's formal cause of death was "a sudden fatal cardiac arrhythmia, after accident."  Dr. Baik's testimony was based on his years of experience as a forensic pathologist and Mora's autopsy, which Dr. Baik personally performed.  Dr. Baik explained to the jury that sudden cardiac arrhythmias are often caused by trauma and that automobile collisions can be particularly traumatic, both physically and emotionally.  This testimony underscores the significance of the collision in this case, which was of such a great magnitude that it split Mora's pickup truck into two pieces and bent the frame of the cab.  Although Dr. Baik agreed that it was possible Mora's heart attack may have started before the accident, Dr. Baik saw nothing that would lead him to believe that Mora was dead prior to the car collision.  Moreover, Dr. Baik did not quantify what he meant by "possible," and there is no indication that Dr. Baik's opinion changed as to the cause of death or that he did not believe that the collision caused the fatal cardiac arrhythmia,

11.

despite acknowledging that it was possible that the heart attack began before the collision. Accordingly, viewing the evidence in the light most favorable to the judgment, we conclude that Dr. Baik's testimony constituted "substantial evidence" that the collision, and thus, the conduct of Coats, was a substantial factor in Mora's death. (*Carney*, *supra*, 14 Cal.5th at pp. 1138–1139; *Lindberg*, *supra*, 45 Cal.4th at p. 27; *Catlin*, *supra*, 26 Cal.4th at p. 155; *Sanchez*, *supra*, 26 Cal.4th at p. 847.)

Coats relies on Dr. Pietruszka's testimony that the absence of hemorrhaging around all of Mora's fractured ribs means that Mora was dead before the collision. We agree that this is a plausible implication of some of Dr. Pietruszka's testimony, particularly when combined with Dr. Baik's testimony that some of the rib fractures were caused by CPR and others were caused by the collision.[5] However, Dr. Pietruszka acknowledged that this case dealt with a "very fine line" in terms of the collision, Mora's medical history, and methamphetamine, and he did not know the actual effect of the collision on Mora. Therefore, this is not a straightforward case from a pathological perspective, and there is a degree of uncertainty in Dr. Pietruszka's opinions. In contrast, Dr. Baik testified that he saw nothing from the autopsy report that would lead him to believe that Mora's heart attack occurred prior to the collision and opined that the collision was "the event" that caused Mora's sudden cardiac arrhythmia. This is a tacit disagreement with Dr. Pietruszka's testimony and conclusions. "This disagreement

---

[5] We note, however, that Dr. Pietruszka did not testify that any of the rib fractures were caused by the collision. Instead, he testified that the absence of hemorrhaging around the ribs led him to conclude that the fractures did not occur at the time of impact and were likely caused by CPR. Further, defense counsel during closing argument argued that CPR could have caused Mora's rib fractures. Nevertheless, if some of the ribs broke because of the collision as Dr. Baik testified, then Dr. Pietruszka's testimony that hemorrhaging would be expected if there was blood flowing would seem to support the conclusion that Mora was already dead at the time of the collision. That is, if there are rib fractures that were caused by the collision, but there was no hemorrhaging around those fractures, then the absence of hemorrhaging indicates that Mora was dead before the collision.

among the experts was for 'the jury to resolve … , accepting such of it, or none of it, as they saw fit.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 326; see also *People v. Flores* (2006) 144 Cal.App.4th 625, 633 ["The credibility and weight of the expert[s'] testimony was for the jury to determine[.]"].) The jury clearly resolved that disagreement by accepting Dr. Baik's testimony and conclusions. We will not second guess the jury's weight and credibility determinations. (See *Jackson*, at p. 326; *People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 162; *Flores*, at p. 633.)

In sum, substantial evidence supports the jury's finding as to causation. (*Carney*, *supra*, 14 Cal.5th at pp. 1138–1139; *Lindberg*, *supra*, 45 Cal.4th at p. 27; *Catlin*, *supra*, 26 Cal.4th at p. 155; *Sanchez, supra*, 26 Cal.4th at p. 847.)

## II.     INSTRUCTIONAL ERROR

### A.     Parties' Arguments

Coats argues the trial court committed instructional error when it added a sentence to CALCRIM number 592. Coats argues the added sentence erroneously directed the jury as to the order in which they should consider the charged offenses. Coats also argues the added sentence amounts to structural error that requires reversal because it shifted the burden to him to prove that he was not intoxicated.

The People argue in part that the trial court properly instructed the jury because the instructions informed the jury that the People had the burden of establishing all elements of each offense. The People argue that the instruction did not shift any burden to Coats, and the added sentence merely helped the jury to understand the lesser included offenses at issue. Alternatively, the People aver any error was harmless.

### B.     Additional Information

The trial court instructed the jury on the count 1 charge of gross vehicular manslaughter while intoxicated, as well as five lesser included offenses. As to count 1, the court gave the jury CALCRIM number 590 ("CALCRIM 590"), "Vehicular Manslaughter While Intoxicated." That instruction, as given, read in part:

13.

"The defendant is charged in Count 1 with gross vehicular manslaughter while intoxicated in violation of Penal Code section 191.5(a).

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.     The defendant drove under the influence of an alcoholic beverage;

[¶] . . . [¶]

"Instruction 2110 (Driving Under the Influence of Alcohol) tells you what the People must prove in order to prove that the defendant drove under the influence of an alcoholic beverage.

[¶] . . . [¶]

"The People have the burden of proving beyond a reasonable doubt that the defendant committed gross vehicular manslaughter while intoxicated.  If the People have not met this burden, you must find the defendant not guilty of that crime, and then consider the lesser-included crimes, described below."

Relatedly, CALCRIM number 2110 ("CALCRIM 2110") explained to the jury what the "People must prove" and that a person is under the influence of an alcoholic beverage if his "mental or physical abilities are so impaired that he or she is no longer able to drive a vehicle with the caution of a sober person, using ordinary care, under similar circumstances."  Also, the instruction explained that if "the People have proved beyond a reasonable doubt that the defendant's blood alcohol level was 0.08 percent or more at the time of the chemical analysis, you may, but are not required to, conclude that the defendant was under the influence of an alcoholic beverage at the time of the alleged offense."

The trial court also gave the jury CALCRIM number 592 ("Instruction 592"), "Gross Vehicular Manslaughter."  In part, this instruction read:

"Gross vehicular manslaughter is a lesser crime than gross vehicular manslaughter while intoxicated, a violation of Penal Code section 191.5(a), as charged in Count 1.  *You should consider this crime if you believe that*

14.

*Daniel Coats was grossly negligent, but was not intoxicated, at the time of the accident.*

"To prove the defendant is guilty of gross vehicular manslaughter, the People must prove [four elements.]

[¶] . . . [¶]

"The People have the burden of proving beyond a reasonable doubt that the defendant committed gross vehicular manslaughter. If the People have not met this burden, you must find the defendant not guilty of that crime."

The italicized last sentence above, that the jury should consider this offense if they believe Coats was grossly negligent but not intoxicated, was added by the court; it is not part of a standard CALCRIM 592 instruction.

C.      Legal Standard

Claims of instructional error are reviewed de novo. (*People v. Lewis* (2023) 14 Cal.5th 876, 900 (*Lewis*); *People v. Thomas* (2023) 14 Cal.5th 327, 382 (*Thomas*).) Thus, an " 'appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.' " (*Lewis*, at p. 900; *People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).) If a defendant contends that an instruction misstates the law, the reviewing court " 'must consider whether there is a reasonable likelihood that the trial court's instruction caused the jury to misapply the law in violation of the Constitution.' " (*Lewis*, at p. 900; *Mitchell*, at p. 579.) " 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*Thomas*, at p. 382; *Sanchez, supra,* 26 Cal.4th at p. 852.) Courts do not review only a part of an instruction or an instruction in isolation, rather courts evaluate the entirety of the jury instructions as given. (See *Lewis*, at p. 900; *Thomas*, at p. 382.) If reasonably possible to do so, reviewing courts interpret an instruction in a manner that supports the judgment, as opposed to defeating it. (*People v. Mani* (2022) 74 Cal.App.5th 343, 377 (*Mani*); *People v. Quinonez* (2020) 46 Cal.App.5th 457, 465.)

15.

Depending on the nature of the error, harm from an instructional error will be assessed under either the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), or the probability of a more favorable outcome standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).  (*People v. Hendrix* (2022) 13 Cal.5th 933, 942.)

### D.     Analysis

#### 1.     Improper Direction of Order of Consideration

Coats's argument that Instruction 592 improperly directed the jury as to the order in which they could consider the charged offenses has been forfeited for two independent reasons.  First, Coats's attorney failed to object to any aspect of Instruction 592. (*Mitchell*, *supra*, 7 Cal.5th at p. 579; *Catlin*, *supra*, 26 Cal.4th at p. 149.)  Second, the argument is inadequately developed because there is no supporting authority cited and the argument amounts to two sentences and three lines in the opening brief.  (*In re Marriage of Carlisle* (2021) 60 Cal.App.5th 244, 255; *Blizzard Energy, Inc. v. Schaefers* (2021) 71 Cal.App.5th 832, 854.)

Alternatively, even if the issue has not been forfeited, there was no error. Contrary to Coats's assertion, the added sentence does not prohibit consideration of certain offenses, nor does it mandate the jury to consider the offenses in a particular order; it merely explains how one particular lesser included offense may apply in relation to count 1.  Considering that there were five lesser included offenses at issue with respect to count 1, providing additional guidance to help the jury navigate through the lesser included offenses was proper.

Finally, even if the argument has not been forfeited, and even if the instruction is erroneous as argued by Coats, there is no harm.  Instruction 592 could only have applied had the jury determined that Coats was not intoxicated.  However, defense counsel conceded during closing argument that Coats was guilty of "drinking and driving."  In addition to this concession, the evidence of Coats's intoxication was overwhelming.

16.

After the police stopped Coats, he was observed to be mumbling and unstable on his feet and to have red watery eyes, slow lethargic movements, a staggered gait, and a strong odor of alcohol on his breath. Further, the blood taken from Coats after the accident showed a BAC of 0.135, which was extrapolated to be a BAC of 0.231 at the time of the accident. Both of these numbers are well above the legal limit. (Veh. Code, § 23152, subd. (b); see also *People v. McNeal* (2009) 46 Cal.4th 1183, 1197.) Given this evidence and defense counsel's concession, it is hardly surprising that the jury found Coats guilty of gross vehicular manslaughter *while intoxicated*. Because the jury found Coats was intoxicated, Instruction 592 had no application to this case. Therefore, under either the beyond a reasonable doubt standard of *Chapman*, or the probability of a more favorable outcome standard of *Watson*, any error with respect to this aspect of Instruction 592 was harmless.

### 2. Shifting the Burden of Proof

The last sentence of Instruction 592's opening paragraph is not part of the model instruction and was added during trial. As quoted above, that sentence reads: "You should consider this crime if you believe that Daniel Coats was grossly negligent, but was not intoxicated, at the time of the accident." We cannot agree with Coats that this sentence shifts the burden of proof in any way.

With respect to the actual language of the added sentence, the sentence informs the jury that they can consider the gross vehicular manslaughter lesser included offense if they believe Coats acted with gross negligence but was not intoxicated. The sentence does not use the terms "burden" or "burden of proof," does not discuss or relate to any burden of proof, and does not assign or shift a burden to Coats. Nor does the sentence state or imply that Coats must prove, disprove, or establish anything, let alone that he must show that he was not intoxicated at the time of the accident. Instead, the sentence merely helps the jury to understand how or when one of the five lesser included offenses

17.

to count 1 may apply in this case. In other words, the sentence is informational in nature; it is not burden-shifting or burden-creating.

With respect to Instruction 592 as a whole, the very next sentence after the added sentence explains to the jury what "the People must prove" in order for Coats to be found guilty of gross vehicular manslaughter. Intoxication is not mentioned again in Instruction 592. Instruction 592 ends by informing the jury that the People have the burden of proving beyond a reasonable doubt that Coats committed gross vehicular manslaughter and, if the People do not meet this burden, then Coats must be found not guilty. Therefore, within Instruction 592, the only sections that discuss what elements of gross vehicular manslaughter must be proved, and which party bears the burden of proving those elements, both expressly place the burden on the People and set the burden at beyond a reasonable doubt; they do not place any burden on Coats.

With respect to the jury instructions as a whole, CALCRIM 590 informs the jury of the elements that the People must prove in order for Coats to be found guilty of gross vehicular manslaughter while intoxicated, including that Coats drove under the influence of an alcoholic beverage. CALCRIM 590 refers the jury to CALCRIM 2110 "for what the People must prove in order to prove that [Coats] drove under the influence of an alcoholic beverage." In turn, CALCRIM 2110 informs the jury of the elements that "the People must prove" in order to show that Coats drove under the influence of an alcoholic beverage. Finally, CALCRIM 590 also informs the jury that the People have the burden of proving beyond a reasonable doubt that Coats committed gross vehicular manslaughter while intoxicated and, if the People do not meet this burden, then Coats must be found not guilty. Therefore, the two other relevant instructions that deal with intoxication both clearly place the burden of proving intoxication on the People, not on Coats.

From the above, we conclude the sentence added to Instruction 592 does not shift the burden of proving "non-intoxication" to Coats. The language of the sentence itself, as well as the language of CALCRIM 590, CALCRIM 2110, and the remainder of

18.

Instruction 592 all make it clear that the jury should consider the crime of gross vehicular manslaughter if they believe in part that the People failed to prove beyond a reasonable doubt that Coats was intoxicated. Under this interpretation, there is nothing erroneous about Instruction 592. Therefore, we presume that the jury interpreted Instruction 592 in this manner. (*Thomas*, *supra*, 14 Cal.5th at p. 382; *Mani*, *supra*, 74 Cal.App.5th at p. 377.) As a result, Coats has failed to show that there " 'is a reasonable likelihood that the trial court's instruction caused the jury to misapply the law in violation of the Constitution.' " (*Lewis*, *supra*, 14 Cal.5th at p. 900.)

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL

### A.    Parties' Arguments

Coats argues his counsel was constitutionally ineffective in three respects. First, Coats argues his counsel deficiently failed to impeach A.C. and E.F. with a prior inconsistent statement. Coats contends that according to a police report, A.C. and E.F. stated that Mora was already dead when then they first saw him and did not say they saw Mora draw his last breath. Second, Coats argues that his counsel deficiently failed to question Dr. Baik with evidence that Mora had suffered cardiac arrest prior to the collision as evidenced by the absence of hemorrhaging around the rib fractures. Coats contends the absence of hemorrhaging shows that Mora's heart had already stopped by the time the collision fractured Mora's ribs. Finally, Coats argues his counsel deficiently failed to introduce evidence that he had suffered a recent traumatic brain injury. Coats contends this evidence would explain why he could not provide all information or answer all questions at the hospital and would counter the suggestion that Coats was malingering, faking, or being evasive. Coats argues that each of these deficiencies by defense counsel was prejudicial and requires reversal of his convictions.

The People argue Coats failed to establish either deficient performance or prejudice. With respect to failing to cross-examine A.C. and E.F., the People in part argue that the claim must be rejected because it depends on evidence that is not part of

the record.  With respect to failing to cross-examine Dr. Baik on the absence of hemorrhaging, the People argue that Coats is mischaracterizing Dr. Pietruszka's testimony, and that defense counsel could have been concerned that Dr. Baik would give harmful answers.  With respect to failing to elicit evidence of Coats's prior brain injury, the People argue that counsel may have concluded it was unnecessary to draw attention to the prior brain injury.  Further, whether Coats was or was not malingering at the hospital does not relate to causation, which was the primary issue at trial.

### B.　Additional Background

The prosecutor filed a motion in limine to exclude "any party's self-diagnosis of physical or mental conditions."  [Capitalization omitted.]  The motion sought to preclude any evidence of Coats's mental or physical conditions or diagnoses, and their effect on Coats's ability to drive, without a proper foundation and a showing of relevance.  At the motions in limine hearing, the prosecutor explained that he was concerned by statements made by Coats that he "suffered a traumatic brain injury or [great bodily injury] in the months preceding the incident."  Defense counsel explained that the relevance of the self-diagnosis depended in part on whether Coats chose to testify, and that the diagnosis may answer any implications from the police officers that Coats was faking symptoms or seizures while officers were trying to talk to him at the hospital.  The trial court ruled that Coats "cannot testify that he has been diagnosed with a traumatic brain injury because that is hearsay, and that is beyond his own expertise.  He can discuss what symptoms he has.  I think that is correct if it is relevant."

### C.　Legal Standard

The Sixth Amendment guarantees the " 'right to the effective assistance of counsel.' "  (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).)  "A defendant who claims to have been denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice."  (*Buck v. Davis* (2017) 580 U.S. 100, 118 (*Buck*); *People v. Linton* (2013)

56 Cal.4th 1146, 1166.)  A deficient performance is one in which counsel fell below an objective standard of reasonableness under prevailing professional norms.  (*People v. Arredondo* (2019) 8 Cal.5th 694, 711 (*Arredondo*).)  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  (*Cullen v. Pinholster* (2011) 563 U.S. 170, 189 (*Cullen*); *In re Long* (2020) 10 Cal.5th 764, 773 (*Long*).)  It is also strongly presumed that counsel made all significant decisions in the exercise of reasonable professional judgment.  (*Cullen*, at p. 189; *People v. Padilla* (1995) 11 Cal.4th 891, 935 (*Padilla*).)  Further, courts will defer to counsel's reasonable tactical decisions.  (*Arredondo*, at p. 711; see also *Cullen*, at pp. 195–196.)  Prejudice occurs where there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant.  (*Cullen*, at p. 189; *People v. Woodruff* (2018) 5 Cal.5th 697, 761 (*Woodruff*).)  In turn, a "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  (*Cullen*, at p. 189; *Woodruff*, at p. 762.)

Ineffective assistance of counsel claims should generally be pursued through habeas corpus proceedings.  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 (*Nguyen*); *People v. Mai* (2013) 57 Cal.4th 986, 1009.)  This is because on direct appeal, a court may find deficient performance only if:  (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 (*Johnsen*); *Mai*, at p. 1009.)  If counsel's tactics or strategic reasons for challenged decisions do not appear on the record, courts will not find ineffective assistance of counsel unless there could be no conceivable reason for counsel's acts or omissions.  (*Johnsen*, at p. 1165; *Nguyen*, at p. 1051.)  Given this framework, "[r]arely is ineffective assistance of counsel established on [direct] appeal since the record usually sheds no light on counsel's reasons for action or inaction."  (*Woodruff*, *supra*, 5 Cal.5th at p. 736.)

### D. Analysis

#### 1. Impeachment With Prior Inconsistent Statements

The parties agree that the police report at issue is not part of the record on appeal. This creates a fatal deficiency. "Appellate jurisdiction is limited to the four corners of the record on appeal[.]" (*In re Carpenter* (1995) 9 Cal.4th 634, 646.) Reviewing courts "cannot consider on appeal evidence that is not in the record." (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1249; see also *People v. Wilson* (2005) 36 Cal.4th 309, 344, fn. 8.) Because Coats's ineffective assistance of counsel claim depends on our ability to review and assess the police report, we are without jurisdiction to entertain his ineffective assistance of counsel claim. (*Fairbank*, at p. 1249; *Carpenter*, at p. 646.)

#### 2. Cross-Examination of Dr. Baik

The record does not reveal why defense counsel did not ask Dr. Baik about hemorrhaging around the broken ribs, and there is no place in the record where defense counsel was asked for his reasons. As a result, we will not find ineffective assistance of counsel unless there could be no conceivable reason for defense counsel's omission. (*Johnsen*, *supra*, 10 Cal.5th at p. 1165; *Nguyen*, *supra*, 61 Cal.4th at p. 1051.) We can conceive of a rational reason for counsel's omission.

Dr. Pietruszka testified that "generally" pathologists will note hemorrhaging around a fracture, and he did not recall seeing anything in Dr. Baik's autopsy report about hemorrhaging around Mora's fractured ribs. The record does not reflect how Dr. Baik would have responded to questions about either hemorrhaging around Mora's ribs, his notations on the autopsy report, or whether he "generally" noted hemorrhaging around fractures in his autopsy reports. It is possible Dr. Baik could have testified that he generally does not note the presence of hemorrhaging around a fracture. Such an answer would undercut the premise that no hemorrhaging was present because the typical notation was absent. Further, the parties did not provide a copy of the autopsy report. It is possible that Dr. Baik could have pointed out a section in the autopsy report where

22.

hemorrhaging was noted, despite Dr. Pietruszka's contrary memory. Finally, it is not uncommon for medical experts to reach different conclusions or have differing medical opinions. It is not clear whether Dr. Baik would agree that, given the nature of the rib fractures, the forces from the collision affecting Mora's body, and the possible timing between a possible pre-collision fatal cardiac arrhythmia and the collision itself that no hemorrhaging would be expected around Mora's ribs. If Dr. Baik disagreed, Dr. Pietruszka's opinion would then have been expressly challenged or contradicted by a fellow expert pathologist. The uncertainty as to what Dr. Baik's answers could have been may well have caused defense counsel to refrain from challenging Dr. Baik on these points. (*People v. Fatone* (1985) 165 Cal.App.3d 1164, 1174 ["We recognize leading authorities on the subject of cross-examination suggest counsel should never ask a question without knowing the answer in advance[.]"].)

Normally, the decision as to what to ask and how to cross-examine witnesses comes within the " 'wide range of tactical decisions competent counsel must make,' " and it is generally only in extreme cases, such as when devastating evidence is elicited, that counsel's conduct during cross-examination will be found to be incompetent. (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.) Moreover, we strongly presume both that defense counsel's conduct falls within the wide range of reasonable professional assistance and that defense counsel made all significant decisions in the exercise of reasonable professional judgment. (*Cullen*, *supra*, 563 U.S. at p. 189; *Long*, *supra*, 10 Cal.5th at p. 773; *Padilla*, *supra*, 11 Cal.4th at p. 935.) Given the uncertainties with respect to what Dr. Baik's testimony would have been, as well as the applicable presumptions of defense counsel's competence, we cannot conclude that this is such an extreme case that the failure of Coats's counsel to cross-examine Dr. Baik regarding hemorrhaging was deficient. (See *Cullen*, at p. 189; *Long*, at p. 773; *Cleveland*, at p. 746; *Padilla*, at p. 935.) In the absence of a deficient performance, there can be no ineffective

assistance of counsel. (*Strickland*, *supra*, 466 U.S. at p. 697; *People v. Camino* (2010) 188 Cal.App.4th 1359, 1377.)

### 3.    Evidence of Prior Brain Injury

The record does not reveal why defense counsel did not attempt to introduce evidence about Coats's prior brain injury, and there is no place in the record where defense counsel was asked for his reasons. As a result, we will not find ineffective assistance of counsel unless there could be no conceivable reason for defense counsel's omission. (*Johnsen*, *supra*, 10 Cal.5th at p. 1165; *Nguyen*, *supra*, 61 Cal.4th at p. 1051.) We can conceive of at least two rational reasons for defense counsel's omission.

First, because Coats exercised his constitutional right not to testify, the only way to present evidence related to his brain injury would be through either medical records or testimony from a physician. However, we do not know what kind of brain injury Coats had, nor do we know the type of symptoms that Coats could reasonably be expected to experience. It is possible that the medical evidence available to Coats, be it in the form of medical records or a physician's live testimony, would have been contrary to his case or insufficiently supportive of him. Under such circumstances, counsel could have reasonably decided to forgo the issue. (*Cullen*, *supra*, 563 U.S. at p. 189; *Long*, *supra*, 10 Cal.5th at p. 773; *Padilla*, *supra*, 11 Cal.4th at p. 935.)

Second, it is possible that counsel concluded that Coats's behavior at the hospital was insignificant. The principal issue at trial was causation. While discussing the elements of gross vehicular manslaughter while intoxicated, defense counsel explained during his closing argument: "and then the third element, which is the element that is most at question in this case, and the element that everyone here is – is going to concentrate on, is whether or not Mr. Coats'[s] actions caused the death of Mr. Mora on that evening." If, as Coats claims, Mora died due to methamphetamine ingestion and not as a result of the collision, then the collision could not have caused Mora's death and Coats would be exonerated of most of the charges against him. Whether Coats was

faking symptoms or malingering at the hospital plays absolutely no part in the determination of whether the collision caused the fatal cardiac arrhythmia/Mora's death. Counsel could have reasonably concluded that taking time to call additional witnesses or submit additional documents on a point that was unrelated to the primary disputed issue was distracting and unbeneficial. (*Cullen*, *supra*, 563 U.S. at p. 189; *Long*, *supra*, 10 Cal.5th at p. 773; *Padilla*, *supra*, 11 Cal.4th at p. 935.)

Alternatively, even if we found a deficient performance, there was no harm. As just explained, the key issue in this case was causation. If Mora's sudden cardiac arrhythmia was caused by methamphetamine and occurred prior to the collision as Dr. Pietruszka's testimony indicates, then Coats would be exonerated of a number of crimes. If the collision was the event that caused Mora to have sudden cardiac arrhythmia as Dr. Baik testified, then Coats's conduct was a proximate cause of Mora's death. Under either Dr. Pietruszka's theory or Dr. Baik's theory, whether Coats was faking symptoms or malingering in the presence of the police is irrelevant. Additionally, during closing argument, the prosecutor did not argue that Coats was faking symptoms or malingering and did not mention this aspect of the evidence to the jury. The nature of the closing arguments shows that suggestions of malingering or faking were at best a minor issue. Therefore, we detect no probability related to defense counsel's omission that is sufficient to undermine our confidence in the outcome of the trial. (*Cullen*, *supra*, 563 U.S. at p. 189; *Woodruff*, *supra*, 5 Cal.5th at p. 762.)

In sum, because Coats has failed to establish either a deficient performance or prejudice, he has failed to establish that he received ineffective assistance of counsel. (*Buck*, *supra*, 580 U.S. at p. 118; *People v. Thompson* (2022) 83 Cal.App.5th 69, 119.)

## IV.    CUMULATIVE ERROR

Coats argues that the cumulative effect of the errors identified in this appeal were prejudicial and resulted in an unfair trial. However, as discussed above, Coats has not

demonstrated error.  Therefore, in the absence of any errors, there can be no cumulative error.  (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 32.)

## **DISPOSITION**

The judgment is affirmed.


                                                                    FAIN, J.*

WE CONCUR:


LEVY, Acting P. J.


PEÑA, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.