Filed 1/21/26  P. v. Ortega CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN LUIS ORTEGA,<br><br>    Defendant and Appellant. | D084409<br><br><br>(Super. Ct. No. SCD290598) |

APPEAL from a judgment of the Superior Court of San Diego County, Evan P. Kirvin, Judge.  Affirmed.

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, A. Natasha Cortina, Supervising Deputy Attorney General, and Kelly Johnson, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted Juan Luis Ortega of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1), and found true allegations that he personally used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)). The court sentenced him to a 26-year-to-life state prison term: 25 years to life for the murder and one year for the deadly weapon enhancement. Ortega's sole contention is that his counsel was prejudicially ineffective for failing to request a jury instruction on voluntary intoxication, requiring reversal of his murder conviction. Ortega concedes the record does not reveal why his counsel did not request the instruction, but he maintains there is no satisfactory reason not to ask for it in his case, pointing out the defense that his counsel pursued—that he did not commit the crime—had no reasonable chance of success given the trial court's refusal to permit third party culpability evidence. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

In the morning of June 18, 2021, police responded to a home in Mira Mesa after receiving a neighbor's radio call about a man covered in blood, running in the street. Officers came upon Ortega, who was agitated, cursing and yelling that he wanted to get back inside the house. Ortega was wearing only cargo shorts, and had a large amount of blood on his torso, as well as his arm and leg. Officers entered the home and found Robert Lizotte in the garage on the floor, with a kitchen knife embedded in his face. The knife matched a set of knives found in the kitchen. There was no other individual in the house. Lizotte had blunt force injuries, as well as at least 16 stab wounds. The stab wound to his head penetrated portions of his brain, and was immediately life threatening. Lizotte died from the multiple stabbings.

---

[1] Undesignated statutory references are to the Penal Code.

Neighbors that morning who witnessed Ortega running out of Lizotte's house described him as "very erratic" and "really panicky." One neighbor, J.N., started recording Ortega because the situation was scary, Ortega was very concerned, and there was blood. J.N. knew what people looked and acted like when under the influence of illegal drugs, and it seemed to her that Ortega was on a drug and was acting consistently with what she had seen in that respect. Ortega was anxious for the officers to come.[2]

The day before, Lizotte's off-and-on girlfriend, J.F., was at Lizotte's house, where she saw Ortega. J.F. had met Ortega in 2014, when she and Lizotte were living together. The three were going out to attend a funeral, but beforehand, J.F. saw Lizotte and Ortega enter Lizotte's garage, where she knew they were using drugs. J.F., who was in drug recovery and had been around people under the influence of methamphetamine, knew that Lizotte was still using methamphetamine. Ortega said things to J.F. that made her think he was under the influence of methamphetamine, including asking her if Lizotte was hiding anyone in his house or asking Lizotte if he was involved in a rumor about Ortega raping someone. However, Ortega did not seem angry at Lizotte and Lizotte did not appear to be annoyed or irritated with Ortega.

J.L. was good friends with both Ortega and Lizotte, and lived around the corner from Lizotte. Ortega showed up at J.L.'s house around 10:00 p.m. on June 17, 2021, and told her he was going to Lizotte's house. J.L. also went to Lizotte's house that night to give Lizotte a haircut; she had spent time in Lizotte's garage many times with both Lizotte and Ortega. After she arrived,

[2] Lizotte's house had surveillance cameras, and numerous surrounding homes also had surveillance cameras. A camera trained on Lizotte's backyard fence from about 9:00 a.m. on June 17, 2021, to 6:00 a.m. on June 18, 2021, did not show anyone climb over.

3

another individual, J.R., showed up at Lizotte's house. J.L. later told officers that Ortega had been talking about using drugs that night, but J.L. did not recall seeing drugs in the house. J.L. did not see Lizotte and Ortega fighting or engaged in any conflict.

J.R. was another good friend of Lizotte's who went to his house almost every day. He arrived at Lizotte's house at about 3:00 a.m. on June 18, 2021, where he saw Lizotte and Ortega, whom J.R. had known for about five years. J.R. was under the influence of drugs and had done methamphetamine at Lizotte's house before. J.R. stayed only a couple of hours, and when he left only Lizotte and Ortega remained. J.R. felt Ortega looked "a little bit bothered" that night, and that Ortega and Lizotte had something to talk about. He told officers later that Ortega seemed to be irritating Lizotte a lot. Ortega was saying things to J.R. like, "What would happen if I pulled a gun on you or if I pulled a knife on you," and had been talking about pulling a gun or a knife all night. J.R. told officers he was trying to keep his contact with Ortega at a minimum that night because of how Ortega was acting.

Another friend of Lizotte's, E.M., went to Lizotte's house on the night of June 17, 2021, to return a wheelbarrow he had borrowed. At the house, E.M. saw only Lizotte and Ortega, whom he had never met before. While there, E.M. smoked methamphetamine, as did Lizotte and Ortega. E.M. told police that Ortega that night kept talking about killing and death; Ortega made a comment about killing people in different apartment buildings to make the property value go down, which made E.M. uncomfortable. E.M. left after just about an hour partly because of how Ortega was making him feel.

Ortega's blood on June 18, 2021, contained both methamphetamine and amphetamine, a methamphetamine metabolite, at 65 and 9 nanograms per milliliter respectively. A toxicologist testified at trial that there is no per se

4

level or limit for when a methamphetamine user becomes impaired, as with alcohol.

*In Limine Request to Present Third Party Culpability Evidence*

Before trial, Ortega's counsel moved to admit evidence that a neighbor of Lizotte's who had used drugs with him and had argued about some missing methamphetamine could have committed the murder. The trial court denied the request as to that individual, finding there was no specific direct or circumstantial evidence linking him to the crime. It ruled the probative value was outweighed by the undue consumption of time, confusion of issues and prejudice under Evidence Code section 352. The court explained, however, that Ortega was free to argue that someone else had committed the crime.

*Defense Case*

Ortega testified in his defense that he did not hurt or kill Lizotte; there was nothing Lizotte could have done or said that would lead Ortega to hurt him. He had known Lizotte since the mid-1990's and considered him like an older brother. He and Lizotte had been roommates on occasion. Their friendship included using drugs together. Ortega had struggled with addiction through periods of his life.

Ortega recounted the events of June 17, 2021, including attending the funeral with Lizotte and J.F. and returning to Lizotte's house, where they smoked methamphetamine and washed their cars. Ortega left Lizotte's

house a couple of times to visit friends, went to the store, and returned to Lizotte's house for the last time at about 3:00 or 4:00 in the morning.[3]

According to Ortega, he helped J.R. return to his car, then walked back in the house, where Lizotte was on the couch watching a video. Ortega made a joke about what Lizotte was watching, but when Lizotte ignored him, he went to the backyard to smoke a cigarette. Ortega then reentered the house to the living room. Lizotte was not there, and Ortega assumed he went to sleep. Ortega decided to lay down and close his eyes, because his vision was getting blurry. After he rested, he got up and injected methamphetamine again in a bathroom, which "knocked [him] to [his] feet." The shot was "very, very, very overwhelming"; the intensity of the methamphetamine made him close his eyes and drop to the floor.

After a while, Ortega felt a fast movement or thuds from behind, which spooked him. He thought police were coming into the house, so out of paranoia he got up and hid in the bathtub with the shower curtain closed. He waited, but heard nothing. He thought he was "trippin' " and assumed it was an effect from being high. He left the bathroom trying to "shake it off"

---

[3] Ortega recalled the events: "Um, I believe I stopped by to visit a friend of mine, um, [A.S.], and I stopped by to let him know how the funeral went, let him know that I was at [Lizotte's]. Um, I stopped very briefly— [¶] He has one of my friends' urns of another friend that had passed away, so I think I smoked a cigarette with him, and then—um, he's another big brother of mine, and he, um—and so he just told—just told me, you know, what I'm saying, like, don't get into any—don't get into any trouble out here, you know, and then just—that's it. [¶] You know, and then I returned back to [Lizotte's], and then I believe I went to the store a couple times, and then, um—and then that's about it." He also remembered seeing E.M. at Lizotte's house. Ortega testified he noticed E.M. seemed "down on his luck," so Ortega, who worked in property management and had knowledge of government programs, gave him a business card to try to get him a place to stay.

6

and called towards the living room to Lizotte. Lizotte's bedroom door was open and Ortega could not see him in his bed, so he checked the garage, where he found Lizotte on the floor and unresponsive. Ortega ran up, got down on his knees and tried to feel a pulse, but then saw the knife and panicked. He then tried to lift Lizotte up, putting his arms around him but he was dead weight. Ortega ran back and forth from the body to the door, trying to find a light switch. He then heard something behind him, thought he saw shapes indicating somebody was hiding, then ran back into the house, changed clothes when he saw all the blood on him, and ran outside where he eventually asked neighbors to call police.

A crime scene specialist later documented the scene. While conducting a walk-through of Lizotte's house, she saw that a window of the northwest bedroom was open and lacked a screen. The windowsill and the window's track had apparent bloodstains, but she did not swab it or dust it for fingerprints. Nor did the specialist do DNA swabs on drawers containing the similar kitchen knives, or the door handles of the kitchen and backyard sliding doors. She located shoes and clothing with bloodstains wrapped in a towel in the master bathroom. There was a pair of scissors and glass breaker in the garage, but they were not swabbed or tested. Though Lizotte's house had surveillance cameras, no cameras captured any of the home's exit and entry points. Lizotte's house also had a doorbell camera that would send notifications to his phone, but police did not take screen captures of any of those notifications.

*Closing Arguments*

Defense counsel pointed out to the jury that the case against Ortega was based on circumstantial evidence. She emphasized that witnesses saw no fighting or disagreements between Lizotte and Ortega on June 17, 2021,

7

but said they were great friends. Counsel discussed the fact that detectives did not make efforts to view Lizotte's phone or the doorbell camera footage, and did not test blood on the windowsill or other items in the house that were consistent with injuries Lizotte had sustained. She argued it was reasonable to conclude someone could have accessed the house without being captured on surveillance video because Ortega left via a back sliding glass door and was not seen on video. She argued Ortega did not try to hide his bloody clothing or leave in his car, and he had no injuries despite the fact Lizotte had 16 different stab wounds, including some that were three to four inches deep, requiring much force. Counsel pointed out that Lizotte was five inches taller than Ortega and weighed almost 30 pounds heavier, though Ortega suffered no injuries. She argued there was no evidence of motive because Ortega did not kill Lizotte.

## DISCUSSION

Ortega contends his counsel was prejudicially ineffective for not requesting a jury instruction on voluntary intoxication or pursuing that defense.[4] He argues the issue is cognizable on direct appeal because there could be no reasonable basis for his counsel's decision to present a defense based on creating reasonable doubt that Ortega committed the crime (which he characterizes as "hopeless") versus an intoxication defense, which he says

---

[4] Evidence of voluntary intoxication is admissible on whether the defendant "actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4; see also *People v. Soto* (2018) 4 Cal.5th 968, 975.) CALCRIM No. 625 instructs the jury that it may consider evidence of a defendant's voluntary intoxication in deciding whether the defendant acted with an intent to kill or with deliberation and premeditation. That instruction's use note states the instruction is "a specific application of CALCRIM No. 3426, Voluntary Intoxication, to homicide." CALCRIM No. 3426 is used in nonhomicide offenses requiring a specific intent.

8

was "the only defense that was supported by substantial evidence." Ortega points to evidence that surveillance video did not show anyone other than him entering Lizotte's house after J.R. left, or that anyone other than he and Lizotte were in the house from then on. He also argues the failure of police to collect evidence is not a substitute for affirmative evidence, and it was not likely to raise a reasonable doubt. According to Ortega, "[t]he possibility that there might have been a way for some person who wanted Lizotte dead somehow to kill him and get away with doing so completely undetected had no realistic chance of raising a reasonable doubt."

## I. *Legal Standards*

We apply well-settled standards to Ortega's claim of ineffective assistance of counsel. (*People v. Stanley* (2006) 39 Cal.4th 913, 954.) To make out such a claim, " ' "a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Rices* (2017) 4 Cal.5th 49, 80; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.) " ' " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citation.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]. 'Tactical errors are generally not deemed reversible, and counsel's

9

decisionmaking must be evaluated in the context of the available facts.' " ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 86; see also *In re Long* (2020) 10 Cal.5th 764, 773; *Strickland*, at p. 694.)

" 'In determining whether counsel's performance was deficient, we exercise deferential scrutiny. [Citations.] The appellant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics.' " (*People v. Loza* (2012) 207 Cal.App.4th 332, 351.) " 'When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was " ' "no conceivable tactical purpose" ' for counsel's act or omission." ' " (*People v. Aguirre* (2025) 18 Cal.5th 629, 679; see also *People v. Barrett* (2025) 17 Cal.5th 897, 1014; *People v. Mickel* (2016) 2 Cal.5th 181, 198.) Thus, where the record is silent in this way, " ' " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." ' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982; *Barrett*, at p. 1014.)

The California Supreme Court in *People v. Wader* (1993) 5 Cal.4th 610 addressed a claim of ineffective assistance on grounds of defense counsel's failure to ask for a voluntary intoxication jury instruction. There, the defendant, who shot his robbery victim in the chest, killing her, testified at trial that he did not intend to kill the victim, only to scare her. (*Id.* at pp. 630-631.) The defendant had used cocaine and methamphetamine "all night on the night of the murder." (*Id.* at p. 631.) The court held his counsel was not ineffective for failing to request a voluntary intoxication instruction: "According to defendant, he did harbor a specific intent when he fired the third and fatal shot—to scare the victim, and nothing more. An instruction

on voluntary intoxication as negating specific intent would have been inconsistent with defendant's theory of the case. Accordingly, we cannot say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication." (*Wader*, 5 Cal.4th at p. 643.)

Later, in *People v. Olivas* (2016) 248 Cal.App.4th 758 (*Olivas*), the Sixth District Court of Appeal considered a similar ineffective assistance claim where the defendant was convicted of numerous felonies arising out of his continuous abuse of a minor over an eight-year period. (*Id.* at pp. 760, 770-771.) The appellate court rejected the claim, finding "multiple tactical reasons" supported counsel's decision not to request a voluntary intoxication instruction, despite evidence the defendant was drunk when he touched the victim. (*Id.* at p. 722.) First, it was inconsistent with the defendant's primary defense theory, which was that he had not committed the crimes: that the victim had lied when she was young because she did not like the defendant, and even if the jury believed her, the victim did not describe things that met the requirements for the offenses. (*Id.* at p. 771.) The court observed that though counsel argued there was insufficient evidence of force, that argument did not undermine the primary defense theory in the same way as a voluntary intoxication instruction would have. (*Ibid.*) Further, assuming there was evidence the defendant was voluntarily intoxicated during some of the incidents, he "offered no evidence at trial to demonstrate how that intoxication might have resulted in his inability to formulate the specific intent necessary" for the offenses. (*Id.* at pp. 771-772.) In the absence of such evidence, his counsel "could reasonably have made the tactical decision not to request a voluntary intoxication instruction." (*Id.* at p. 772.)

II. *Ortega Has Not Demonstrated Constitutionally Ineffective Assistance*

As in *People v. Wader, supra,* 5 Cal.4th 610 and *Olivas, supra,* 248 Cal.App.4th 758, Ortega has not met his burden to show ineffective assistance, because a defense based on voluntary intoxication would have been inconsistent with his primary defense theory that he did not kill Lizotte. Under the circumstances, Ortega has not overcome the strong presumption (*In re Long, supra,* 10 Cal.5th at p. 773) that his counsel's decision to forego instruction on voluntary intoxication was within the broad range of reasonable professional assistance.

Nor did Ortega's counsel's tactical decision "f[a]ll below an objective standard of reasonableness" under prevailing professional norms. (*People v. Rices, supra,* 4 Cal.5th at p. 80; see also *In re Long, supra* 10 Cal.5th at p. 776.) His counsel plainly determined that the state of the evidence tying Ortega to Lizotte's murder—including his presence at the house in the early morning hours alone with Lizotte, the blood on his clothing, his odd or paranoid comments that morning, and possible friction between him and Lizotte—was outweighed by evidence tending to show Ortega's innocence— his and Lizotte's long friendship, the testimony of witnesses seeing nothing amiss between the men, the absence of injuries to Ortega's body, investigators' failure to swab or test numerous items for fingerprints or DNA, the lack of surveillance on certain doors of Lizotte's house, and Lizotte's home being a hub for drug use. In our view, counsel reasonably decided the evidence was such to raise a reasonable doubt in the mind of jurors as to whether Lizotte had committed the brutal stabbing murder of his longtime friend. We are cautioned not to " ' " 'second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' " ' " (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 86; *People v. Stanley, supra,* 39 Cal.4th at p.

12

954; *People v. Loza*, *supra*, 207 Cal.App.4th at p. 351) and we decline to do so here.

Further, we agree with the People that there is no evidence Ortega's methamphetamine use that night affected the "actual formation of specific intent" or his ability to premeditate and deliberate as required to warrant such an instruction. (*People v. Williams* (1997) 16 Cal.4th 635, 647, 677-678; accord, *Olivas*, *supra*, 248 Cal.App.4th at pp. 771-772; *People v. Verdugo* (2010) 50 Cal.4th 263, 295 [defendant is entitled to voluntary intoxication instruction only where there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's actual formation of specific intent].) *Williams* held a defendant convicted of first degree murder was not entitled to a voluntary intoxication instruction in the face of evidence he was " 'probably spaced out' " on the morning of the killings, and his police interview statements that he was " 'doped up' and 'smokin' pretty tough then' " around the time of the killings. (*Id.* at p. 677.) The court held that even if the "scant" evidence was substantial, there was "no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent." (*Williams*, at pp. 677-678; see also *People v. Ivans* (1992) 2 Cal.App.4th 1654, 1662 [substantial evidence did not support an instruction on voluntary intoxication where, even though the defendant testified "he had been high on speed for a month and had been awake for three or four days," the defendant "gave detailed testimony about the events" on the morning of the crime].) Here, Ortega's ability to drive after he smoked methamphetamine that night, and his detailed recollection of events, cuts against such a conclusion.

In reply, Ortega cites to evidence that after he injected methamphetamine in the bathroom, he felt overwhelmed, sat on the floor,

13

and got paranoid, hearing noises, but this is the sort of scant evidence that does not shed light on his ability to formulate intent, premeditate or deliberate. He also points to the toxicologist's testimony about symptomology of methamphetamine on users generally.[5] The toxicologist was unable ultimately to give any opinion on the symptoms caused by the levels of methamphetamine found in Ortega's blood.!(9 RT 1943)! The question here is whether in view of the evidence, Ortega's counsel's decision not to seek a voluntary intoxication instruction was reasonable. Since the court properly refuses an instruction that is not supported by substantial evidence (*People v. Williams*, *supra*, 16 Cal.4th at p. 677; see also *People v. Souza* (2012) 54 Cal.4th 90, 116; *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 99), we conclude it was.

Ortega seeks to distinguish *Olivas*, *supra,* 248 Cal.App.4th 758 as analytically different. According to him, the Court of Appeal in that case failed to consider that some of the charged sex offenses (violation of section 269) did not require a specific intent, and thus a voluntary intoxication offense would not have applied to those counts. He argues "[t]he actual tactical considerations applicable to the question whether to rely on intoxication negative specific intent [*sic*] thus would have been whether to

---

[5] The toxicologist explained that a user in a "binge phase" stage of methamphetamine use "may experience a rapid flight of ideas or an inability to focus on one thing at a time, so their speech might be rapid or incoherent, they may have very large or boisterous movements because it can cause involuntary muscle controls or the inability to sit still. Pulse is usually elevated, body temperature is elevated, so an individual may sweat, and it can cause dilated pupils as well." She testified a methamphetamine user in a "crash phase" "may have problems with their balance and coordination, have disorganized or slow speech, maybe not able to fully answer questions." We do not see this generic testimony about such symptoms as substantial evidence that Ortega's "intoxication affected [his] actual formation of specific intent." (*People v. Williams*, *supra*, 16 Cal.4th at p. 677.)

14

rely on a defense to all charges, or to rely on a defense that, if accepted, would have no effect on the five counts of violating section 269—charges that would have resulted in a sentence virtually equivalent to one of life without parole." He argues that this is what made pursuing a voluntary intoxication instruction unreasonable, and made the "only reasonable tactical decision" the one based on a defense to all counts. Ortega argues that his case involved only one count to which voluntary intoxication applied, and his counsel's defense had no realistic chance of success, particularly in view of the court's refusal to allow third party culpability evidence. The argument does not convince us to disregard *Olivas*, which did not engage in the analysis posited by Ortega. Cases do not stand for propositions not considered. (*People v. Nash* (2020) 52 Cal.App.5th 1041, 1078.) And we disagree with the argument's premise, that is, Ortega's assessment of the existence or strength of the evidence in this record pointing to his innocence.

We are not persuaded by Ortega's other arguments to the contrary, which rely on the asserted weakness of an innocence defense. Ortega argues the defense was based on speculation and "had no realistic possibility of success" whereas the voluntary intoxication defense was "not completely hopeless." According to Ortega, voluntary intoxication "was the only defense that was supported by substantial evidence." We question Ortega's application of standards this court applied in *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485 to assess the reasonableness of counsel's decision to pursue a defense of innocence based on the trial

evidence.[6]  Setting that aside, " ' "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." ' "  (*People v. Jennings* (1991) 53 Cal.3d 334, 378.)  We cannot say on this record that Ortega's counsel's tactical decision was so unreasonable as to amount to constitutionally ineffective assistance.

Ortega's other cited authorities are unavailing.  In *U.S. v. Span* (9th Cir. 1996) 75 F.3d 1383, for example, involving the defendants' encounter with marshals looking for a suspect, defense counsel's failure to request a particular jury instruction was "the result of a misunderstanding of the law"; he thought an unlawful arrest instruction also covered an excessive force defense.  (*Id*. at pp. 1389-1390.)  It was a situation where counsel "intended to present an excessive force defense but failed."  (*Id*. at p. 1389.)  Counsel also failed to establish a foundation for an excessive force defense, which would have allowed the defendants to obtain reversal on appeal.  (*Ibid*.)  Thus, "[c]ounsel's errors with the jury instructions was not a strategic decision to

---

[6]     In *People v. Superior Court (Valenzuela)*, *supra*, 73 Cal.App.5th 485, a panel of this court addressed whether a magistrate made factual findings or reached a legal conclusion so as to apply the proper standard of review to the magistrate's dismissal of charges at a preliminary hearing.  (*Id*. at pp. 490, 496-499.)  Pointing to the magistrate's statement that there was no evidence the defendant saw a knife, we said:  "To conclude there was 'no evidence of X' does not constitute a finding of 'not X.'  This is because '[a]n absence of evidence is not the equivalent of substantial evidence.'  [Citation.]  'No finding can be predicated on the absence of evidence.' "  (*Id*. at p. 498.)  This court held the trial court's statement was a legal conclusion about the sufficiency of the evidence that we reviewed independently.  (*Id*. at p. 499.)  Given the inapposite context, *Valenzuela* and the case it cites for its underlying proposition, *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 655, do not convince us that Ortega's counsel's strategy here—to instill reasonable doubt on whether Ortega was the killer—was wholly unreasonable.

16

forego one defense in favor of another." (*Id*. at p. 1390.)[7]  Here, it is apparent from Ortega's counsel's strategy that she did not inadvertently or mistakenly omit a voluntary intoxication instruction, which would have been inconsistent with the proffered defense that Ortega did not kill Lizotte.  This court is not bound by the other federal district court authorities Ortega relies upon.  (*People v. Avena* (1996) 13 Cal.4th 394, 431.)

Ortega further argues *People v. Hussain* (2014) 231 Cal.App.4th 261 is instructive.  But in *Hussain*, counsel for a defendant charged with grand theft failed to request a "claim of right" instruction—an instruction explaining that a defendant's good faith belief, even if mistaken, that he has a right or claim to property negates felonious intent for purposes of theft—despite the fact that "[c]laim of right was the *core* of defendant's defense to the grand theft charge." (*Id*. at p. 270.)  Thus, "there [could] be no satisfactory reason not to request an instruction to support the core of the defense." (*Id*. at p. 271.)  The court found the omission prejudicial, as evidence showed the defendant had limited education, as well as inability to read or write the English language in a case involving lien sale documents and issues with transferring title to vehicles. (*Id*. at p. 272.)  Thus, the defendant's "[c]ounsel's failure to request an instruction on the key point of his client's defense, which would have supported his argument, deprived defendant of his constitutional right to effective assistance of counsel and require[d] reversal of his conviction." (*Ibid*.)  *Hussain* is inapposite here, where Ortega's claim is that his counsel was ineffective for failing to request

_____

7      The Ninth Circuit has since described *U.S. v. Span* as "exceptional" based on the egregiousness of the facts and magnitude of counsel's incompetence in mishandling of the jury instructions.  (*Weighall v. Middle* (9th Cir. 2000) 215 F.3d 1058, 1063 & fn. 10.)

17

an instruction relevant to a *different* defense, not the defense his counsel pursued.

Ortega urges us to review the evidence in the light most favorable to him, applying standards to determine whether a record contains substantial evidence to support giving an instruction. But the question here is whether Ortega he has overcome the strong presumption that his counsel's decisions were within the range of reasonable professional competence. We conclude that on the state of the evidence, Ortega's counsel's performance was not deficient. Given that conclusion, we need not reach the issue of prejudice.

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


KELETY, J.

18